IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

UNITED STATES OF AMERICA

v.                                                    Case No. 3:23-CR-137-DJN

JOHN GIBSON,

            *Defendant.*

## STATEMENT OF FACTS

The United States and the defendant, JOHN GIBSON (hereinafter, "the defendant"), stipulate that the allegations contained in Count 1 of the Criminal Information and the following facts are true and correct, and that had this matter gone to trial, the United States would have proven each of them beyond a reasonable doubt.

### I.  Introductory Allegations

#### a.  *Victims*

1.      General Electric Company was an American multinational conglomerate based in Boston, Massachusetts (together with its subsidiaries, "GE").

2.      Mitsubishi Heavy Industries, Ltd. was an engineering and electrical equipment manufacturer headquartered in Tokyo, Japan (together with its subsidiaries, "MHI").

3.      Dominion Energy, Inc. was a Virginia-based utility company that provides electricity to four million customers in Virginia, North Carolina, and South Carolina (together with its subsidiaries, "Dominion").

### b. *Defendant*

4.      JOHN GIBSON was a resident of Winter Park, Florida. Beginning in or about 1987 and continuing through in or about June 2020, GIBSON worked in various roles at COMPANY 1, a global industrial manufacturing conglomerate (together with its subsidiaries, "COMPANY 1"). GIBSON was the Executive Vice President of Power Generation and the Head of Sales for North America at COMPANY 1, responsible for the sale of all COMPANY 1 fossil power generation products in North America. In this capacity, GIBSON reported directly to the Chief Executive Officer for Power Generation at COMPANY 1.

### c. *Other Conspirators*

5.      Theodore S. Fasca was a resident of Richmond, Virginia, within the Eastern District of Virginia.[1] From in or about 2005, and continuing through in or about August 2020, Fasca worked at Dominion. From 2008 and continuing through December 2019, Fasca was a manager in Dominion's Generation System Planning group, which focused on positioning Dominion to meet future customer energy needs. From in or about December 2019, and continuing through his date of his resignation in or about August 2020, Fasca worked as the director of the Generation System Planning group at Dominion.

6.      Michael Hillen was a resident of Midlothian, Virginia, within the Eastern District of Virginia.[2] Beginning in 2011 and continuing through the present, Hillen worked as an

---

[1] Theodore S. Fasca separately pled guilty in connection with the same matter. *See* Case No. 3:23-cr-83.

[2] Michael P. Hillen separately pled guilty in connection with the same matter. *See* Case No. 3:23-cr-120.

Account Manager in Power Generation at COMPANY 1. Beginning in or around 2015 and continuing through August 10, 2020, Hillen was responsible for all sales to Dominion.

7.      Co-Conspirator (CC)-2 was a resident of Pennsylvania. At all times relevant to the conspiracy, CC-2 worked at a Regional Sales Manager at COMPANY 1, with a portfolio encompassing COMPANY 1 sales to Dominion.

8.      From in or about 2018, and continuing through in or about 2020, CC-4 was a resident of the United Arab Emirates and the Chief Executive Officer for Power Generation at COMPANY 1.

### d.  Dominion Peaker Project Background

9.      In approximately March 2019, Dominion sought to build a "Peaker" gas turbine plant in Chesterfield, Virginia, within the Eastern District of Virginia. Peaker plants are combustion turbine plants designed to add electricity generation capacity to alleviate high grid load and improve electric grid resiliency. To build the plant, Dominion opened a competitive, closed bid process soliciting requests for proposals from qualified companies. The bid process involved such qualified companies not only providing the equipment for the Peaker Project, but also providing long-term agreements for servicing any equipment provided. In total, the project was estimated to cost Dominion upwards of $500 million.

### II. Non-Disclosure Agreements

10.     As part of the closed bid solicitation process, GE and MHI each executed separate reciprocal non-disclosure agreements ("NDAs") with Dominion, governing the use and disclosure of confidential and proprietary information exchanged throughout the bid process. On or about February 28, 2019, GE and Dominion executed an NDA. Thereafter, on or about March 7, 2019, MHI and Dominion executed an NDA with similar terms to the agreement with GE.

3

11.     The GE and MHI NDAs with Dominion both defined "Confidential Information" as: "[A]ll information of whatever nature, whether or not patentable or copyrightable, in any format relating to the Purpose."[3] The definition of Confidential Information under the NDA further encompassed "all information disclosed to either party that is considered confidential to the disclosing party, including without limitation proprietary technical and business information, trade secrets, . . .formulae, . . .financial information, . . .and any other information designated by the Disclosing Party as confidential or proprietary."

12.     The definition of "Confidential Information" expressly excluded "information that: (a) at the time of disclosure by Disclosing Party, was in the public domain; (b) after disclosure by the Disclosing Party is lawfully published or otherwise becomes part of the public domain; (c) was in the Receiving Party's possession at the time of disclosure to the Receiving Party and was not acquired by the Receiving Party, directly or indirectly, under an obligation of confidence; or (d) after disclosure to the Receiving Party, is received by the Receiving Party from a third party who did not acquire it under an obligation of confidence."

13.     The NDAs required each party to: "(a) protect Confidential Information from disclosure as if it were its own confidential and proprietary information; (b) not directly or indirectly, without express written permission of the Disclosing Party, use any of the Disclosing Party's Confidential Information for any purpose other than the limited purpose of evaluating a potential future contractual relationship as described above; (c) ensure that each of its officers, directors, employees, consultants and legal counsel...abide by the obligations of this

---

[3] The "Purpose" was defined as "limited...[to] facilitating discussions and possible negotiations related to a transaction between Dominion Energy Virginia and [GE and MHI, respectively] for the supply of combustion turbines. . . and for no other purpose."

Agreement. . .and (g) not use Disclosing Party's Confidential Information to prepare to compete, compete, or induce or assist others to compete with the Disclosing Party."

14.      COMPANY 1 and Dominion executed an NDA on or about August 14, 2018.

15.      The NDA stated that "in order to analyze and evaluate the Project, the Parties need to exchange certain confidential and proprietary information" and "each Party is willing to make such disclosure only pursuant to the terms of this Agreement."

16.      The NDA further defined "Confidential Information" as "any information that is owned or controlled by the Disclosing Party. It also includes information of third parties in possession of Disclosing Party that Disclosing Party is obligated to maintain in confidence."

**III. Initial Submittal of Bids to Dominion**

17.      GE, MHI, and COMPANY 1 all submitted bids in response to a request for proposal issued by Dominion for the Peaker Power plant project on or about May 10, 2019.

**IV. GE and MHI Confidential Information**

18.      At all times relevant to the conspiracy, GE and MHI each treated certain technical and pricing information related to the commercial manufacture of combustion turbines as confidential, including: (1) certain design details of various combustion turbines classes; (2) mathematical formulas related to maintenance intervals of combustion turbines; and (3) pricing for various combustion turbine aspects (*e.g.*, unit pricing and bulk pricing for turbine sales, options pricing for various features that improve turbine efficiency and output capacity, and long term service agreement pricing). Such information (hereafter "GE and MHI Confidential Information") was: (1) information that was not in the public domain; (2) information that was only disclosed to Dominion (by GE and MHI, respectively) pursuant to NDAs; (3) information for which GE and MHI took steps to preclude widespread disclosure; (4) information over which

5

GE and MHI, respectively, had the exclusive right to determine when and to what extent such information was disclosed publicly, if at all; (5) information that derived independent economic value from not being in the public domain; and (6) information that encompassed trade secrets, confidential information, and proprietary business information.[4]

19.     Moreover, such GE and MHI Confidential Information were all related to and included in products and services used in and intended for use in interstate and foreign commerce, to wit: (1) combustion turbines that were produced for interstate and foreign commerce by being manufactured, developed, and readied outside of Virginia for subsequent installation in Chesterfield, Virginia (within the Eastern District of Virginia); (2) combustion turbines that were placed in interstate and foreign commerce through their transportation from outside of Virginia to the Eastern District of Virginia for installation; and (3) combustion turbine parts that were produced for interstate and foreign commerce by being manufactured, developed, and readied outside of Virginia for subsequent installation in Chesterfield, Virginia (within the Eastern District of Virginia).

### V. Statutory Allegation

20.     Beginning on a date unknown but no later than on or about May 23, 2019, and continuing through in or about June 2019, in the Eastern District of Virginia and elsewhere, defendant JOHN GIBSON did knowingly and willfully combine, conspire, confederate, and

---

[4] GIBSON knew and had a firm belief that GE and MHI Confidential Information were trade secrets within the meaning of 18 U.S.C. § 1839(3). Furthermore, as GIBSON well knew, the GE and MHI Confidential Information were in fact trade secrets because: (1) GE and MHI each took reasonable measures to keep their information secret; and (2) the information derived independent economic value, actual and potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure and use of the information.

agree with co-conspirators, known and unknown, with the intent to convert trade secrets that were related to and included in a product produced for and placed in interstate and foreign commerce to the economic benefit of someone other than the owners of the trade secrets, and intending and knowing that the offense would injure the owners of the trade secrets, to:

    a.  steal and without authorization appropriate, take, carry away, and conceal, and by fraud, artifice, and deception obtain GE's and MHI's combustion turbine-related trade secrets, in violation of Title 18, United States Code, Section 1832(a)(1);

    b.  without authorization copy, duplicate, sketch, draw, photograph, download, upload, photocopy, replicate, transmit, deliver, send, mail, communicate, and convey GE's and MHI's combustion turbine-related trade secrets, in violation of Title 18, United States Code, Section 1832(a)(2); and

    c.  receive and possess GE's and MHI's combustion turbine-related trade secrets, knowing the same to have been stolen and appropriated, obtained, and converted without authorization, in violation of Title 18, United States Code, Section 1832(a)(3);

and committed at least one overt act in order to effect the object and purpose of the conspiracy, all in violation of Title 18, United States Code, Section 1832(a)(5).

21.    It was the object and purpose of the conspiracy for the conspirators to obtain GE and MHI Confidential Information in order to: (1) improve COMPANY 1's bid for the Dominion Peaker Project; (2) to provide COMPANY 1 with a competitive business advantage in

future bids against GE and MHI; and (3) to enrich COMPANY 1 while causing economic harm to GE and MHI.

### VI. The Ways, Manner, and Means of the Conspiracy

22.     The ways, manner, and means by which GIBSON and his co-conspirators sought to accomplish the object of the conspiracy included, but were not limited to, the following:

a.  With the intent to influence the Dominion Peaker Project bid process, Hillen, CC-2, and other employees at COMPANY 1 utilized COMPANY 1 funds to provide gifts, including football game tickets, hotel accommodations, and dinners, to Fasca and other Dominion employees prior to and during the bid process. COMPANY 1's policy permitted such expenditures to strengthen COMPANY 1's business relationship with Dominion.

b.  Soon after COMPANY 1, GE, and MHI submitted bids to Dominion on or about May 10, 2019, Hillen and Fasca coordinated to have Fasca use his sensitive position of trust within Dominion to misappropriate GE and MHI Confidential Information and then disclose the same to Hillen.

c.  Hillen and Fasca organized to funnel GE and MHI Confidential Information through numerous private email accounts (including through Hillen's wife's Hotmail email address, Fasca's personal Google email address, and Hillen's personal Yahoo address) to conceal the illicit disclosure of GE and MHI Confidential Information to COMPANY 1.

8

d. Hillen thereafter strategically disseminated GE and MHI Confidential Information to CC-2, who subsequently strategically disseminated GE and MHI Confidential Information to GIBSON.

e. Beginning at least on or about May 24, 2019, and continuing through at least on or about June 24, 2019, GIBSON received GE and MHI Confidential Information from CC-2 as part of the conspiracy. GIBSON, knowing and understanding the nature of the Confidential Information he had obtained, used that information to enrich COMPANY 1 and to the detriment of GE and MHI.

f. Knowing the GE and MHI Confidential Information were improperly obtained, GIBSON nevertheless strategically disseminated such GE and MHI Confidential Information to others within COMPANY 1, including other senior executives. GIBSON sent certain GE and MHI Confidential Information to CC-4, to leaders within COMPANY 1's business intelligence unit, and to representatives of COMPANY 1's parent company in Germany. GIBSON's dissemination of GE and MHI Confidential Information was calculated to: (1) provide COMPANY 1 with a competitive advantage in the bid for the Dominion Peaker Project, to the detriment of GE and MHI; (2) improve COMPANY 1's business intelligence; and (3) provide COMPANY 1 with a competitive advantage in future bids against GE and MHI, to the detriment of GE and MHI.

g. After learning of GE's and MHI's bids for the Dominion Peaker Project, GIBSON authorized and obtained approvals within COMPANY 1 that

9

authorized COMPANY 1 to submit a lower bid to Dominion. Specifically, on or about May 30, 2019, COMPANY 1 used the improperly derived GE and MHI Confidential Information to resubmit a lower bid for the Dominion Peaker Project, undercutting GE's bid, which was, by some metrics, more competitive than COMPANY 1's bid at the time.

h.  At all times relevant to the conspiracy, GIBSON, his co-conspirators, and COMPANY 1 knew (or remained willfully blind to) the fact that the disclosed GE and MHI Confidential Information was information COMPANY 1 was not entitled to have.

## VII.  Overt Acts in Furtherance of the Conspiracy

### a.  First Disclosures of Confidential Information & COMPANY 1 Rebid

23.  On or after May 10, 2019, Hillen called Fasca to inquire into "the numbers" of GE's and MHI's bids for the Dominion Peaker Project in order to ascertain whether COMPANY 1's bid had been competitive. Fasca explained that he did not have access to the confidential bid information, but advised Hillen that Fasca could uncover the confidential bid information if Hillen was interested. Understanding that GE and MHI Confidential Information should not be disclosed to COMPANY 1 employees, Hillen asked Fasca to do so.

24.  As Hillen and Fasca well knew, Hillen was inquiring about GE and MHI Confidential Information.

25.  Thereafter, Fasca provided Hillen over the phone with the top line bid amounts by GE and MHI. Those top line bid amounts, as Hillen and Fasca well knew, constituted GE and MHI Confidential Information.

26.    On or about May 23, 2019, consistent with and responsive to Hillen's stated
interest in the confidential bid information of GE and MHI, Fasca emailed documents containing
GE and MHI Confidential Information from his Dominion email address to Fasca's personal
Google email address and subsequently from this Google email address to Hillen wife's Hotmail
email address. The GE and MHI Confidential Information contained in these documents
encompassed unit pricing details for the sale of various numbers of combustion turbines, turbine
emissions specifications, and options pricing for various features that improve turbine efficiency
and output capacity. Hillen then forwarded the email from his wife's Hotmail email address to
his own Yahoo email address and subsequently to his email address with COMPANY 1.
Thereafter, Hillen forwarded the GE and MHI Confidential Information to CC-2.

27.    These transmissions caused the GE and MHI Confidential Information to be
electronically sent between the Eastern District of Virginia and states outside of Virginia
(including to and through Yahoo servers located in California).

28.    On or about May 24, 2019, based on the received GE and MHI Confidential
Information, CC-2 sent an email to GIBSON and other COMPANY 1 executives entitled,
"Dominion – Peaker Update (Confidential)." CC-2 stated, among other things, that GE had "an
approximately $7.5M (3 block) Capital advantage...[and g]iven this Mike and I believe we
should keep our faith in our hand as best we can and if possible provide Dominion further price
reduction." The next day, on or about May 25, 2019, GIBSON forwarded the email from CC-2 to
leaders within COMPANY 1's business intelligence unit. An executive from this business
intelligence unit sent an email back to GIBSON on or about May 25, 2019, concluding "[b]ased
on received Dominion feedback" that "we would have to drop our 3 block price...by $1'5 [$1.5
million] to tie GE." On or about May 25, 2019, GIBSON sent an email to a separate

11

COMPANY 1 employee, stating, "On a pure $/kw [dollar per kilowatt metric], [GE] are just lower. We may need a minor price move. I know we were stressed on the financials but 6 units is big and I hate to lose this one."

29.    GIBSON obtained approval from CC-4 for the price reduction over May 26-27, 2019, while travelling with CC-4 on a business trip.

30.    On or about May 30, 2019, CC-4 sent an email to GIBSON, COMPANY 1 senior executives, and certain members of the Board of Directors of COMPANY 1 with the title, "URGENT: Dominion Bid Modifications." In this email, CC-4 requested approval to reduce COMPANY 1's bid by $3 Million. CC-4 obtained such approval the same day. GIBSON memorialized this approval in an email to CC-4 and other COMPANY 1 executives, stating: "All clear. Bid approved by [COMPANY 1's parent company]."

31.    As a result, on or about May 30, 2019, COMPANY 1 submitted a revised bid offer to Dominion, reducing COMPANY 1's proposed price to make COMPANY 1's bid more competitive in relation to GE's bid and undercutting GE's bid by certain cost metrics.

32.    The same day, on or about May 30, 2019, CC-2 sent a text message to GIBSON, stating, "Just wanted to thank you for your support and help . . .Very much appreciated." GIBSON responded, "We need to win this. I have promised it."

b.  *Subsequent Solicitations, Disclosures of Confidential Information, and Bid Award*

33.    From on or about May 31, 2019, and continuing through on or about June 20, 2019, on at least five separate occasions, Fasca sent additional GE and MHI Confidential Information to Hillen, who then forwarded the information to CC-2 within COMPANY 1.

34. For instance, on June 14, 2019, Fasca sent GE and MHI Confidential Information from his Dominion email address to his personal Google email address and subsequently from his Google email address to Hillen's email address with COMPANY 1. Thereafter, Hillen disseminated this GE and MHI Confidential Information to CC-2. Subsequently, on or about June 24, 2019, CC-2 sent this same GE and MHI Confidential Information to GIBSON via email, which included the word "Confidential" in the subject line. The content of the email stated, "John, As discussed this afternoon. . ." The next day, on or about June 25, 2019, GIBSON forwarded the same GE and MHI Confidential Information to an executive within the COMPANY 1 business intelligence unit, stating: "We really need to understand and dissect this to support us on FPL peakers. . . Please review with [other COMPANY 1 employees], then you guys come meet with me. . . Do not forward this and keep this within a small circle."[5]

35. As another example, on or about June 20, 2019, Fasca sent additional GE and MHI Confidential Information to Hillen's email address with COMPANY 1. The confidential information consisted of MHI's revised bid. Notably, this document was marked "MHPS Proprietary & Confidential Information." Thereafter, Hillen disseminated this confidential information to CC-2. The same day, CC-2 forwarded the same file to GIBSON with the subject line, "Confidential."

36. COMPANY 1 won the bid for the Peaker Project with Dominion.

**VIII.  GIBSON's Statements Regarding Disclosure**

37. In a sworn deposition on or about August 10, 2021, GIBSON acknowledged the following:

---

[5] "FPL Peakers" referred to a separate bid on a Peaker project for a separate utility, Florida Power and Lights. Both COMPANY 1 and GE bid for that work.

    a.  GIBSON's recommendation to COMPANY 1 executives to initiate a "specific price reduction" in May 2019 was driven by GIBSON's knowledge of GE's bid price.

    b.  Without knowledge of GE's bid price in May 2019, COMPANY 1 would "probably not" have initiated a price move.

* * *

38.    For the purpose of calculating GIBSON's advisory range under the United States Sentencing Guidelines, the parties stipulate that the losses to victims reasonably foreseeable to GIBSON were between $25 million and $65 million. GIBSON acknowledges that this stipulation is not binding on the Court or the probation office, and that he will not be permitted to withdraw his plea if the loss calculations ultimately adopted by the Court at sentencing differ from this stipulation.

39.    GIBSON did not financially benefit from his involvement in the conspiracy.

14

1.      The actions of the defendant, as recounted above, were taken willfully, knowingly, and with the specific intent to violate the law. The defendant did not take those actions by accident, mistake, or with the belief that they did not violate the law. This statement of facts sets forth facts necessary to support the defendant's plea of guilty. It does not include each and every fact known to the defendant or to the United States, and it is not intended to be a full enumeration of all of the facts surrounding the defendant's case.

Respectfully submitted,

Jessica D. Aber
United States Attorney

By:

Avi Panth
Kenneth R. Simon, Jr.
Assistant United States Attorneys

15

I have consulted with my attorney regarding this Statement of Facts. I knowingly and voluntarily agree that each of the above-recited facts is true and correct and that had this matter gone to trial the United States could have proven each one beyond a reasonable doubt.

11/8/23
_____
Date

_____
JOHN GIBSON
Defendant

We are counsel for defendant, JOHN GIBSON. We have carefully reviewed this Statement of Facts with him and, to our knowledge, his decision to agree to this Statement of Facts is an informed and voluntary decision.

11/8/23
_____
Date

_____
Timothy D. Belevetz
Kyle Finnegan
Counsel

16