IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal No. 3:23-cr-137 |
| | ) | |
| JOHN GIBSON, | ) | |
| | ) | |
| *Defendant*. | ) | |
| | ) | |

**UNITED STATES' SENTENCING MEMORANDUM**

Defendant John Gibson, the former Executive Vice President of Power Generation and the Head of Sales for North America at a global industrial manufacturing conglomerate (hereafter "Company 1"), knowingly used stolen trade secrets of two competitor companies, General Electric Company (hereafter "GE") and Mitsubishi Heavy Industries, Ltd. (hereafter, "MHI"), to cheat on a competitive bid to build a $500 million gas power plant – all for the benefit of Company 1. For the reasons outlined below, the United States respectfully submits that a sentence at the high end of the Guidelines sentencing range is sufficient but no greater than necessary to meet the purposes of 18 U.S.C. § 3553(a).

I.   **PROCEDURAL HISTORY AND PRESENTENCE REPORT**

On November 8, 2023, the defendant pled guilty to a single count criminal Information, charging the defendant with Conspiracy to Convert Trade Secrets, in violation of 18 U.S.C. § 1832(a)(5). The maximum penalty for this offense is 10 years' imprisonment, 3 years' supervised release, a $250,000 fine, and a $100 mandatory special assessment. The Court has scheduled sentencing for September 25, 2024. The Presentence Investigation Report ("PSR")

reflects that the defendant's applicable Guidelines range is 46 to 57 months' imprisonment, based on an adjusted offense level of 23 and a criminal history category of I. *See* ECF No. 18 ("PSR") ¶¶ 63-64. The government has no objections or corrections to the PSR. The Probation Office correctly applied the following Guidelines provisions, which have garnered no defense objections:

(1) The base offense level is 6, pursuant to Section 2B1.1(a)(2). PSR ¶ 20.

(2) The defendant received a 22-level increase because the losses reasonably foreseeable to Gibson were between $25 million and $65 million. *Id.* ¶ 21.

(3) The defendant received a three-level decrease for acceptance of responsibility and a further two level decrease for being a first time offender. *Id.* ¶¶ 26-28.

\* \* \*

The United States respectfully requests that this Court adopt the PSR's facts and Guidelines calculations and sentence the defendant at the top of the Guidelines range.

## II. ARGUMENT IN SUPPORT OF A HIGH END OF GUIDELINES SENTENCE

The Supreme Court has declared, "[a]s a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." *Gall v. United States*, 552 U.S. 38, 41 (2007). This Court, therefore, "must first calculate the Guidelines range, and then consider what sentence is appropriate for the individual defendant in light of the statutory sentencing factors, 18 U.S.C. § 3553(a), explaining any variance from the former with reference to the latter." *Nelson v. United States*, 555 U.S. 350, 351 (2009). When the court, in consideration of the Section 3553 factors, imposes a non-Guidelines sentence, it must give serious consideration to the extent of the deviation and provide an explanation "to allow for meaningful appellate review and to promote the perception of fair sentencing." *United States v. Diosdado-Star*, 630 F.3d 359, 365 (4th Cir. 2011) (internal quotation marks omitted).

Section 3553(a)(1) provides that, in determining a sentence, courts must consider the nature and circumstances of the offense as well as the history and characteristics of the defendant. 18 U.S.C. § 3553(a)(1). Additional factors outlined in section 3553(a)(2) include the need for the sentence to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment for the offense, to afford adequate deterrence to criminal conduct, to protect the public from further crimes of the defendant, and to provide the defendant with needed education or vocational training, medical care, or other corrective treatment in the most effective manner. 18 U.S.C. § 3553(a)(2); *United States v. Shortt*, 485 F.3d 243, 247 (4th Cir. 2007) (noting that subsection (a)(2) of section 3553 includes "factors that a court must consider in determining a particular sentence").

In this case, in light of the nature and circumstances of the offense and the need to reflect the seriousness of the offense and afford adequate deterrence, the government respectfully recommends that the defendant's conduct, considered in conjunction with the sentencing factors set forth in 18 U.S.C. § 3553(a), calls for a sentence at the top end of the applicable sentencing Guidelines range. Such a sentence is sufficient but not greater than necessary to comply with the purposes of 18 U.S.C. § 3553(a).

**A. Nature and Circumstances of the Offense**

   *i. Background and Factual Statement*

In 2019, Dominion sought to build a power plant in Chesterfield, Virginia costing over $500 million. Statement of Facts ("SOF"), ECF No. 15 ¶ 9. Termed a "peaker" power plant, this Dominion project was specifically meant to alleviate electrical grid load at times of peak electrical usage, improving overall grid resiliency and the availability of electricity. Dominion opened a competitive, closed bidding process to solicit proposals from qualified companies to

bid on the project. To ensure the integrity of the bidding process, in advance of these bids, Dominion executed separate reciprocal non-disclosure agreements ("NDAs") with each company bidding for work, restricting the use and disclosure of confidential and proprietary information.[1] *Id.* ¶¶ 7, 11. On May 10, 2019, three companies submitted confidential bids for the work: General Electric Company (hereafter "GE"), Mitsubishi Heavy Industries, Ltd. (hereafter, "MHI"), and Company 1, a global manufacturing conglomerate. *Id.* ¶ 14.

Thereafter, on multiple occasions, Gibson and at least two other co-defendants at Company 1 (Regional Sales Manager Mehran Sharifi and Regional Account Manager Michael Hillen), in combination with Theodore S. Fasca (Director of Generation System Planning at Dominion), conspired to convert the trade secrets and confidential information of GE and MHI to illicitly benefit Company 1 in their efforts to win the Dominion work.[2]

The same day that Dominion received these bids, Hillen, who was part of Company 1's sales team, called Fasca to inquire into "the numbers" of GE and MHI's bids. SOF ¶ 23. Thereafter, Fasca provided Hillen with confidential information constituting GE and MHI's bid amounts. *Id.* ¶ 25. Then, on May 23, 2019, at Hillen's request, Fasca emailed documents containing confidential information of GE and MHI to Hillen. *Id.* ¶ 26. To conceal the illicit nature of this misappropriation of GE and MHI information, Fasca sent the files from his Dominion email address to his personal Google address and subsequently from this Google

---

[1] The confidential information at issue in this case encompassed, among other things, unit pricing details of the sale of various numbers of combustion turbines, options pricing for various features that improve efficiency and output capacity, and information related to the long-term servicing of the turbines.

[2] These other co-conspirators have all pled guilty in the same matter. *See United States v. Hillen*, Case No. 3:23-cr-120 (E.D. Va.); *United States v. Sharifi*, Case No. 3:24-cr-20 (E.D. Va.); *United States v. Fasca*, Case No. 3:23-cr-87 (E.D. Va.).

4

email address to Hillen's wife's Hotmail address. *Id.* Hillen then forwarded these emails along to his email address at Company 1, after which Hillen strategically disseminated the confidential information to Mehran Sharifi (listed as CC-2 in the SOF). *Id.* ¶¶ 26, 28.

Sharifi, who was better positioned than Hillen to know what to do with the confidential information, then sent an email to Gibson with an analysis of the confidential information. Sharifi noted that GE had a "Capital advantage" (*i.e.*, more competitive price on capital equipment) based on the latest bid and recommended "provid[ing] Dominion [with a] further price reduction." *Id.* ¶ 28. Noting the analysis, Gibson stated in an email on May 25, 2019, "On a pure $/kw [dollar per kilowatt metric], [GE] are just lower. We may need a minor price move. I know we were stressed on the financials but a 6 unit [turbine project] is big and I hate to lose this one." *Id.* In the ensuing days, Gibson corresponded with members of the Board of Directors of Company 1 and the Chief Executive Officer for Power Generation of Company 1, obtaining approvals from Company 1's parent company in Germany to submit a revised offer predicated on the improperly-obtained confidential information. *Id.* ¶ 30. Thereafter, on May 30, 2019, Company 1 submitted a lowered bid. The same day, Sharifi sent a text message to Gibson stating, "Just wanted to thank you for your support and help. . . Very much appreciated." Gibson responded, "We need to win this. I have promised it." *Id.*

Gibson did not just try to make use of the improperly obtained confidential information on the Dominion project; he also sought to use the information to advantage Company 1 in other bids against the same competitors. For example, Gibson sent certain confidential information he received to other Company 1 employees within Company 1's business intelligence unit, stating "We really need to understand and dissect this to support us on FPL peakers…Please review

5

with [other Company 1 employees], then you guys come meet with me…Do not forward this and keep this within a small circle."[3]

To his credit, Gibson promptly accepted responsibility when confronted by law enforcement and pled guilty pre-indictment.

### ii. Aggravating Mitigating Factors Not Considered in Guidelines

The government acknowledges certain aggravating and mitigating factors that are not reflected in the Guidelines range calculation.

*First*, unlike many defendants who face sentencing under U.S.S.G. § 2B1.1, Gibson did not obtain fraud proceeds from the criminal activity. The Statement of Facts permits an inference that Gibson's standing at Company 1 was tied to Company 1's efforts to win the bid. *See, e.g.,* SOF ¶ 32 (Gibson: "We need to win this. I have promised it."). However, this is still qualitatively different than Gibson pocketing $25 million to $65 million in fraud proceeds or attempting to do so. Nevertheless, this merit does not rise to the level of a downward departure under U.S.S.G. § 2B1.1 App. N. 21(C) for "overstat[ing] the seriousness of the offense." In denying a downward departure on this same basis for a co-defendant, the Court previously noted that criminal misconduct compromising the integrity of a competitive marketplace is a serious offense.

*Second*, the government does not argue for an abuse of a position of trust enhancement under U.S.S.G. § 3B1.3, because Company 1 is itself a co-conspirator. Rather than breaching Company 1's trust, Gibson's (and multiple other Company 1 co-defendants') deliberate choices to steal trade secrets redounded primarily to the benefit of Company 1. Nevertheless, the Court should still consider that Gibson's misconduct was only possible because Fasca broke the trust

---

[3] "FPL Peakers" referred to a separate bid for a separate utility, Florida Power and Lights. Both Company 1 and GE bid for that work. SOF ¶ 34 n.5.

placed in him by Dominion in sending confidential information to Company 1. With each use of GE and MHI confidential information, Gibson too indirectly breached the sanctity of the NDAs on which GE and MHI relied in making submittals to Dominion.

*Third*, the guidelines do not fully account for Gibson's senior standing as a corporate executive within Company 1. Gibson warrants greater punishment, because as a senior executive with over 30 years of service to Company 1, he was a tone-setter. PSR ¶ 60. Gibson deserves greater punishment for being instrumental in getting the Company 1 rebid approved and in sending GE and MHI confidential information to Company 1's business intelligence team. And without Gibson's advocacy for the rebid to Chief Executive Officer for Power Generation at Company 1, the rebid would not have been approved by Company 1. To be sure, the higher stipulated loss amount in the Guidelines ($25 million to $65 million) relative to other individual co-defendants partially accounts for Gibson's senior standing within Company 1 relative to Sharifi and Hillen.[4] For example, by virtue of his position, Gibson could foresee the harms associated with the incorporation of competitor confidential information into future Company 1 bids against competitors in a way that Hillen could not. As another example, by virtue of his position, Gibson had a more nuanced understanding of the economic rationale for Company 1's Dominion bid relative to other individual co-defendants. On balance, however, Gibson's senior standing at Company 1 should push the Court higher in the Guidelines range.

*Fourth,* the Court should consider that Gibson's misconduct was not a singular or isolated incident. Even after Gibson obtained Company 1 approval for a rebid in May 2019 predicated on improperly obtained competitor confidential information, Gibson continued to receive and make

---

[4] Though Sharifi has not yet been sentenced, the government anticipates arguing that Sharifi's foreseeable losses were at least $9.5 million to $25 million.

use of additional improperly-obtained competitor confidential information. *See* SOF ¶¶ 34, 35 (detailing Gibson's use of competitor confidential information that Sharifi sent in June 2019).

\* \* \*

In all, Gibson's conduct was serious and compromised the integrity of the bid process for a critical infrastructure utility project worth over $500 million. Without Gibson, certain elements of the misconduct would not have taken place. The nature and circumstances of the offense call for a high end of Guidelines range sentence.

### B. History and Characteristics of the Defendants

The defendant's history and personal characteristics support a high end of Guidelines range sentence and do not establish any extraordinary circumstances warranting either a downward departure or variance from the applicable Guidelines range. The PSR does not reveal anything remarkable about the defendant's background that explains or mitigates the serious offense conduct. The PSR largely reflects that Gibson grew up in a stable household – raised "in a peaceful area [and] . . .loved and cared for by his parents[, who]. . . met all his material needs." PSR ¶¶ 41, 42. Though Gibson faced some hardship in having an alcoholic father, *id* ¶ 41, Gibson appears to have surmounted any attendant issues later in life. Gibson graduated from the University of Florida with a degree in Industrial and Systems Engineering and became a senior executive at Company 1. *Id.* ¶¶ 57, 60. At the time of his retirement in June 2020, after a career spanning over 30 years, Gibson was making $326,000 per year plus bonuses. *Id.* Gibson appears to be in good health and does not suffer from any mental, emotional, or substance abuse issues. *Id.* ¶¶ 48-56.

Gibson has no criminal history, and the misconduct at issue here, while exceptionally serious, is a single criminal violation in an otherwise well-lived life. The Guidelines already account for this meritorious conduct in providing Gibson with a § 4C1.1 first time offender

8

reduction and a Criminal History Category I. The Court should not further reduce Gibson's sentence based on his lack of criminal history.

In all, Gibson experienced greater stability at the time he committed his crime than many other similarly situated defendants who come before this Court, and any hardships reflected in the PSR have no nexus to the crime. This factor supports a high end of Guidelines sentence.

### C. Need for the Sentence Imposed to Afford Adequate Deterrence

Specific deterrence does not drive the sentence. However, general deterrence is a prime consideration. The Court must consider how to deter others as a general matter from engaging in similar conduct. *See, e.g.*, *United States v. Morgan*, 635 F. App'x 423, 450 (10th Cir. 2015) ("General deterrence comes from a probability of conviction and significant consequences. If either is eliminated or minimized, the deterrent effect is proportionally minimized."). That is particularly true in the case of fraud cases, which are difficult to detect, investigate, and prosecute. *See, e.g.*, *United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006) ("Because economic and fraud-based crime are more rational, cool, and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence.") (internal quotation marks omitted). Absent a substantial term of imprisonment in this case, general deterrence—"the effort to discourage similar wrongdoing by others through a reminder that the law's warnings are real and that the grim consequence of imprisonment is likely to follow"—will not be achieved. *United States v. Bergman*, 416 F. Supp. 496, 499 (S.D.N.Y. 1976).

A strong sentence achieves general deterrence in three specific ways. *First*, this is not the first time and will not be the last time that senior corporate executives cross into the threshold of criminal activity to garner improper competitive advantage. A strong sentence sends an unequivocal message to corporate actors who operate in competitive marketplaces: Cheating and stealing to get ahead mean jail time. While the government may not detect every instance of

9

wrongdoing, corporate bad actors who are caught will be punished severely. *Second*, a strong sentence sends a message that people who commit corporate crimes will be *individually* held responsible, rather than punishment only gripping a corporate entity. *Lastly,* because frauds that corrupt the competitive marketplace can have consequential downstream effects on peoples' livelihoods and the economy, the sentence must send a strong message that such criminal activity will be severely punished.

### D.  Need for the Sentence Imposed to Reflect the Seriousness of the Offense

The Court must fashion a sentence to address a key collateral consequence of this criminal activity: Loss of confidence in the integrity of competitive marketplaces. With each piece of confidential information that Gibson improperly used, Gibson trampled on the trust that GE and MHI placed in Dominion – a trust in the integrity of the bidding process. GE and MHI submitted their bids to Dominion relying on their confidential information and trade secrets being held secure. (This reliance is evidenced by NDAs executed in advance of GE and MHI sending confidential information to Dominion.) And by virtue of his position, Gibson knew these sensitivities. If market participants are not able to rely on promises that their confidential information and trade secrets would be held secure, such participants may be reluctant to enter economic transactions. This harm is magnified where individuals who pervert competitive marketplaces are let free with a proverbial slap on the wrist. A strong sentence, in contrast, restores a measure of trust in the competitive marketplace by sending a message to market participants that the government takes market integrity seriously and that market participants can rely on promises made to keep confidential information safe.

### E.  Need for the Sentence Imposed to Avoid Disparity

The fact that Gibson's crimes involve bid documents instead of hand-to-hands and back alleys should not allow him to escape the often significant prison terms imposed on less

sophisticated defendants. *See United States v. Levinson*, 543 F.3d 190, 201 (3d Cir. 2008) ("probationary sentences for white collar crime raise concerns of sentencing disparities according to socio-economic class"); *United States v. Stefonek*, 179 F.3d 1030, 1038 (7th Cir.1999) ("Business criminals are not to be treated more leniently than members of the 'criminal class' just by virtue of being regularly employed or otherwise productively engaged in lawful economic activity. . . Criminals who have the education and training that enables people to make a decent living without resorting to crime are more rather than less culpable than their desperately poor and deprived brethren in crime.").

### F.  Fashioning Just Punishment

In fashioning a just punishment, it is important for the Court to stack up Gibson's criminal conduct in the context of his co-defendants. Gibson should receive the highest sentence of all his co-defendants.

Of all the co-defendants, Fasca and Hillen were the tip of the iceberg. Their primary roles in the misconduct were to obtain and then transfer the stolen confidential information from Dominion to Company 1. To be sure, without either Hillen or Fasca, the crime would never have been possible, because the confidential information of GE and MHI would have never made it to Company 1. However, neither Fasca nor Hillen were the main drivers of Company 1's rebid to undercut competitors based on the illicit information. Neither Fasca nor Hillen were particularly well positioned to have visibility into how Company 1 could make optimal use of the stolen information.

Sharifi is more culpable than Fasca and Hillen. After receiving the confidential information from Fasca, Hillen sent the confidential information to Sharifi in each instance, because Sharifi was better positioned than Hillen to know what to do with the information. Sharifi then strategically disseminated the information to others in Company 1. Sharifi also

11

analyzed the competitor information along with other Company 1 employees, and Sharifi advocated directly to Gibson for Company 1 to rebid predicated on the improper information. In short, Sharifi was a key driver of Company 1's illicit rebid effort.

Gibson was the most culpable defendant. By virtue of his position as a senior corporate executive at Company 1, Gibson had the most insight and knowledge of how to make improper use of the stolen confidential information of GE and MHI. Gibson was crucial to engineering Company 1's rebid, with Sharifi's assistance. Gibson even ensured that the stolen confidential information would be incorporated into Company 1's business intelligence databases to give Company 1 an advantage over GE and MHI in other bids. Gibson corresponded directly with the Chief Executive Officer for Power Generation at Company 1 to obtain final approval for Company 1's illicit price move predicated on the confidential information of competitors.

### III.    FINE

At the sentencing hearings for both Fasca and Hillen, after finding that both defendants had the ability to pay fines, the Court imposed $3,600 fines, payable over the three years of their respective terms of supervised release. Both Fasca and Hillen had Guidelines fine ranges of $15,000 to $150,000; therefore, the Court's imposed fines were 76% below the bottom end of their respective Guidelines fine ranges. With a net worth in excess of $7.5 million, John Gibson has the ability to pay a fine. PSR ¶ 62. His Guidelines range fine is $20,000 to $200,000. For consistency with other co-defendants, the Court should impose a fine of $4,800—*i.e.*, 76% below the bottom end of Gibson's Guidelines fine range. The fine provides an additional reminder to Gibson of the seriousness of his offenses.

IV. **CONCLUSION**

For the foregoing reasons, the United States respectfully requests that this Court impose 57-months' incarceration to be followed by three years' supervised release, a sentence sufficient but no greater than necessary to satisfy the purpose of sentencing set forth in 18 U.S.C. § 3553.

JESSICA D. ABER
UNITED STATES ATTORNEY

By:    /s/
Avi Panth
Virginia Bar No. 92450
Kenneth R. Simon, Jr.
Virginia Bar No. 87998
Assistant United States Attorneys
United States Attorney's Office
919 E. Main Street, Suite 1900
Richmond, Virginia 23219
Office Number: (804) 819-5400
Fax Number: (804) 771-2316
E-Mail: Avishek.Panth@usdoj.gov
E-Mail: Kenneth.Simon2@usdoj.gov